# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### WESTERN DIVISION

| | |
|---|---|
| **HUGO TORRES PALMA,** | ] |
| | ] |
| **Petitioner,** | ] |
| | ] |
| **v.** | ]          **7:26-cv-299-EGL-SGC** |
| | ] |
| **JORDAN POWELL et al.,** | ] |
| | ] |
| **Respondents.** | ] |

## <u>MEMORANDUM OPINION</u>

On February 20, 2026, Petitioner Hugo Torres Palma filed a counseled petition for a writ of habeas corpus under 28 U.S.C. § 2241. Doc. 1. He also filed an "emergency motion" for a temporary restraining order, or, in the alternative, for a preliminary injunction. Doc. 4. The Court denied the motion, insofar as it sought a temporary restraining order, because it did not comply with Federal Rule of Civil Procedure 65. Doc. 7. On March 6, 2026, the Court conducted a hearing on Palma's motion for a preliminary injunction and the merits of his petition. *See* Fed. R. Civ. P. 65(a)(2). The Court now **DISMISSES** respondents Jordan Powell, Todd Lyons, Kristi Noem, Mellissa Harper, and Pamela Bondi because they do not have immediate custody of Palma. And because it plainly appears from the petition that Palma is not entitled to relief, the Court **DENIES** his habeas petition (Doc. 1) and **DENIES AS MOOT** his motion for a preliminary injunction (Doc. 4).

## I.    FACTUAL BACKGROUND

Palma is a 42-year-old Mexican national who has been unlawfully present in the United States continuously since 2000. *See* Doc. 1 at ¶23; Doc. 12-1 at 1.

On February 19, 2026, local police in Tallapoosa County, Alabama, arrested Palma after a traffic stop. Doc. 1 at ¶33. He was initially booked into the Jackson Gap municipal jail and, within several hours, was taken into custody by ICE and transferred to the Pickens County Detention Center in Carrollton, Alabama. *Id.* at ¶34. Palma is currently detained at the Adams County Correctional Center in Mississippi. *See* Doc. 12-2. He is scheduled to appear before an immigration judge on March 12, 2026, at LaSalle Detention Facility in Louisiana, based on the Department of Homeland Security's allegations that he is an alien in the country who lacks a valid entry document and who was never admitted or paroled into the United States. Doc. 12-1 at 1, 3.

## II.    JURISDICTION

The habeas statute permits district courts to grant relief only "within their respective jurisdictions." 28 U.S.C. § 2241(a). Jurisdiction depends on the petitioner's location at the time of filing. *See Rumsfeld v. Padilla*, 542 U.S. 426, 434-35, 443 (2004). A subsequent transfer after the petition is filed does not divest a court of jurisdiction. *See id.* at 440-41 (discussing *Ex parte Endo*, 323 U.S. 283, 304-06 (1944)).

Palma was in custody at the Pickens County Detention Center in Carrollton, Alabama, when he filed his petition. *See* Doc. 1 at ¶¶33-34; Doc. 12 at 12-13. Because that facility lies within this district, the Court has jurisdiction over the petition.

The proper respondent in a habeas action is "the person who has custody over" the petitioner. 28 U.S.C. § 2242. The Supreme Court interprets that to mean the petitioner's "immediate custodian," the official with day-to-day physical control who can produce the petitioner if ordered. *Rumsfeld*, 542 U.S. at 434-35, 441-42.

Respondents have demonstrated that the warden of the Adams County Correctional Center in Mississippi currently has custody of Palma. *See* Doc. 12-2. Jordan Powell, the Attorney General, and other "remote supervisory official[s]," are not proper respondents because they lack immediate custody. *Rumsfeld*, 542 U.S. at 435-36.

Accordingly, the Court **DISMISSES** as improper respondents Jordan Powell, Todd Lyons, Kristi Noem, Pamela Bondi, and Mellissa Harper. The Court **SUBSTITUTES** the warden of the Adams County Correctional facility as the proper respondent.

## III. STATUTORY BACKGROUND

Palma challenges his classification as an "applicant for admission" under § 1225(b) of the Immigration and Nationality Act. *See* Doc. 1 at ¶37. He contends

that his continued detention under that provision is unlawful and violates due process, asking the Court to order his immediate and unconditional release. *Id.* at ¶¶129-30. And he wishes to bar the Government from restraining him again absent five days' advance notice and a filing justifying the restraint. *Id.* at ¶127. Although Palma claims the right to a bond hearing under § 1226(a), he rejects that remedy as inadequate because it would, in his view, merely legitimize an unlawful arrest. *Id.* at ¶52.

Resolving those claims requires a brief review of the INA's statutory framework.

Before 1996, the INA treated aliens differently depending on whether they presented themselves at a port of entry or entered the United States without inspection. *Buenrostro-Mendez v. Bondi*, 166 F.4th 494, 498 (5th Cir. 2026); *Matter of Yajure Hurtado*, 29 I. & N. Dec. 216, 222-23 (BIA 2025); *Hing Sum v. Holder*, 602 F.3d 1092, 1099-1100 (9th Cir. 2010). "Entry" was defined as "any coming of an alien into the United States." 8 U.S.C. § 1101(a)(13) (1994). "An alien could achieve 'entry' by physically crossing into United States territory regardless of whether the alien crossed legally or evaded inspection." *Poveda v. U.S. Att'y Gen.*, 692 F.3d 1168, 1174 (11th Cir. 2012). And "[w]hether an alien had 'entered' mattered because 'important immigration provisions were keyed to an alien's "entry."'" *Id.* (quoting *Assa'ad v. U.S. Att'y Gen.*, 332 F.3d 1321, 1328 (11th Cir.

4

2003)). Entry determined both the type of immigration proceeding that applied and whether the alien would be detained while those proceedings were pending. *Hing Sum*, 602 F.3d at 1099.

At the time, the INA "provided for two types of removal proceedings: deportation hearings and exclusion hearings." *Hose v. I.N.S.*, 180 F.3d 992, 994 (9th Cir. 1999) (en banc). Aliens who arrived at a port of entry were placed in exclusion proceedings and were "subject to mandatory detention until the conclusion of the exclusion process and could not request release on bond," whereas "aliens who evaded inspection and were apprehended months or years later could seek release on bond pending deportation proceedings." *Buenrostro-Mendez*, 166 F.4th at 498.

The pre-1996 regime thus created a perverse result: it "afforded greater procedural and substantive rights to aliens who bypassed entry procedures." *Id.* at 498-99 (citing H.R. Rep. No. 104-469, pt. 1, at 225 (1996) ("[I]llegal aliens who have entered the United States without inspection gain equities and privileges in immigration proceedings that are not available to aliens who present themselves for inspection.")). That "unintended and undesirable consequence" allowed aliens who entered without inspection to "take advantage of the greater procedural and substantive rights afforded in deportation proceedings," unlike the aliens who had "actually presented themselves to authorities for inspection." *Martinez v. U.S. Att'y Gen.*, 693 F.3d 408, 413 n.5 (3d Cir. 2012) (quoting *Hing Sum*, 602 F.3d at 1100).

In 1996, however, "Congress changed its mind about how to treat aliens who entered without admission, choosing to stop giving them the process afforded to aliens who were lawfully admitted and instead treat them like aliens who never entered." *Mejia Ayala v. Harper*, No. 1:26-CV-204, 2026 WL 501113, at *2 (N.D. Ala. Feb. 23, 2026). "[T]he 1996 Act … created an upheaval in immigration law." *Poveda*, 692 F.3d at 1174 (internal quotation marks omitted). Among other things, it sought to "ensure[] that all immigrants who have not been lawfully admitted, regardless of their physical presence in the country, are placed on equal footing in removal proceedings under the INA." *Torres v. Barr*, 976 F.3d 918, 928 (9th Cir. 2020) (en banc).

To that end, "Congress closed the entry loophole" with two acts passed in 1996, the Antiterrorism and Effective Death Penalty Act (AEDPA) and the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA). *Mejia Ayala*, 2026 WL 501113, at *2.

With AEDPA, Congress provided the following regarding "removal of aliens who entered the United States":

Section 241 of the [INA] (8 U.S.C. 1251) is amended by adding at the end of the following new subsection: (d) Notwithstanding any other provision of this title, an alien found in the United States who has not been admitted to the United States after inspection in accordance with section 235 is deemed for purposes of this Act to be seeking entry and admission to the United States and shall be subject to examination and exclusion by the Attorney General under chapter 4. In the case of such

> an alien the Attorney General shall provide by regulation an opportunity for the alien to establish that the alien was so admitted.

*Mejia Ayala*, 2026 WL 501113, at *3 (quoting Pub. L. 104-132 § 414(a), (d)). With this provision, "Congress 'deemed' persons who avoided the admission process 'to be seeking entry and admission to the United States' and thus subjected them to the same examination and exclusion procedure as aliens who never entered." *Id.* This provision never took effect because Congress then passed IIRIRA. *See id.* (citing Pub. L. 104-128 § 308(d)(2)(D) (repealing AEDPA § 414)).

With IIRIRA, Congress "aimed to reduce [the] incongruity" created in the pre-1996 version. *Buenrostro-Mendez*, 166 F.4th at 499. In *Mejia Ayala*, this Court noted some of the significant changes brought about with IIRIRA. One change was replacing "the definition of 'entry' with a definition of the terms 'admission' and 'admitted,' which now mean 'with respect to an alien, the lawful entry of the alien into the United States after inspection and authorization by an immigration officer.'" *Mejia Ayala*, 2026 WL 501113, at *3 (comparing 8 U.S.C. § 1101(a)(13)(A) (1994) with 8 U.S.C. § 1101(a)(13)(A) (2026)). In another example, IIRIRA "[m]oved the provisions for deporting admitted aliens from 8 U.S.C. §§ 1251-1252 to 8 U.S.C. §§ 1226-27, where they now reside next to the removal provision for un-admitted aliens (*i.e.*, applicants for admission), *see* 8 U.S.C. § 1225." *Id.* Additionally, IIRIRA rewrote 8 U.S.C. § 1225 "to govern the inspection and removal of aliens who are not admitted to the United States." *Id.* (citing Pub. L. 104-208 § 302). In other words,

immigration laws would no longer distinguish between aliens based on whether they managed to evade detection and enter the country without permission. Instead, the "pivotal factor in determining an alien's status" is "whether or not the alien has been lawfully admitted." H.R. Rep. No. 104-469, pt. 1, at 225. IIRIRA also eliminated the exclusion/deportation dichotomy and consolidated both sets of proceedings into "removal proceedings." *Hurtado*, 29 I. & N. Dec. at 223.

IIRIRA effected these changes through several provisions codified in § 1225 of Title 8:

**Section 1225(a):** Section 1225(a) codifies Congress's decision to make lawful "admission," rather than physical entry, the touchstone for determining how aliens not already lawfully admitted into the country would proceed through the immigration process. The provision states that an alien "present in the United States" who has "not been admitted," or who "arrives in the United States," whether or not at a designated port of entry "shall be deemed … an applicant for admission." 8 U.S.C. § 1225(a)(1). "All aliens (including alien crewmen) who are applicants for admission or otherwise seeking admission or readmission to or transit through the United States shall be inspected by immigration officers." *Id.* at § 1225(a)(3). The inspection by the immigration officer is designed to determine whether the alien may be lawfully "admitted" to the country or, instead, must be referred to removal proceedings.

**Section 1225(b):** The statute then divides applicants for admission into three categories: (1) aliens encountered at the border or a porty of entry; (2) aliens not admitted or paroled who cannot show two years' continuous presence; and (3) all other applicants for admission. *Mejia Ayala*, 2026 WL 501113, at *4. The third "catch-all" category includes aliens like Palma, who entered without admission and have remained in the country for more than two years. *Id.*

Section 1225(b) treats these categories differently. Applicants encountered at the border or a port of entry, and those who entered without admission and have been present for less than two years, are subject to expedited removal "without further hearing or review," unless they express a fear of persecution or seek asylum. 8 U.S.C. § 1225(b)(1)(A)(i). By contrast, an unadmitted alien who has been present in the United States for more than two years "shall be detained for a proceeding" under § 1229a "if the examining immigration officer determines that [the] alien seeking admission is not clearly and beyond a doubt entitled to be admitted." 8 U.S.C. § 1225(b)(2)(A).

While § 1225(b)(2) does not allow for aliens to be released on bond, the INA grants DHS discretion to exercise its parole authority to temporarily release an applicant for admission, but "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). Parole, however, "shall not be regarded as an admission of the alien." *Id.* Moreover, when the

Secretary determines that "the purposes of such parole … have been served," the "alien shall … be returned to the custody from which he was paroled" and be "dealt with in the same manner as that of any other applicant for admission to the United States." *Id.*

**Section 1226:** IIRIRA also created a separate authority addressing the arrest, detention, and release of aliens generally (not "applicants for admission" specifically). *See* 8 U.S.C. § 1226. This provision governs the detention of aliens who were admitted to the country but later become removable, for example, "admitted aliens who overstay or violate the terms of their visas, engage in conduct that renders them removable, or were improperly admitted." *Buenrostro-Mendez*, 166 F.4th at 499; *see also Mejia Ayala*, 2026 WL 501113, at *4 ("Section 1226 broadly covers any 'alien' who is arrested and detained 'on a warrant issued by the Attorney General.'").

The statute provides that "[o]n a warrant issued by the Attorney general, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a). Unlike for § 1225, detention under § 1226 is generally discretionary; the alien "may" either "continue to [be] detain[ed]" or "may" be released on bond or conditional parole. 8 U.S.C. § 1226(a)(1)-(2). In practice, DHS makes the initial custody determination. 8 C.F.R. § 236.1(d)(1). The alien may seek custody redetermination (a bond hearing) before

an immigration judge and may appeal an immigration judge's custody determination to the Board of Immigration Appeals. 8 C.F.R. §§ 236.1(c)(8), (d), 1236.1(d)(1), 1003.19.

That "default rule" of discretionary detention does not apply to certain criminal aliens. *See Jennings v. Rodriguez*, 583 U.S. 281, 288-89 (2018); *see also* 8 U.S.C. § 1226(c)(1)(A)-(E) (setting forth offenses rendering an alien ineligible for bond). Section 1226(c) provides that "[t]he Attorney General shall take into custody" and detain without bond certain classes of criminal aliens: those who are inadmissible or deportable because the alien (1) "committed" certain offenses outlined in 8 U.S.C. §§ 1182 and 1227; or (2) engaged in terrorism-related activities. 8 U.S.C. § 1226(c)(1); *see Nielsen v. Preap*, 586 U.S. 392, 398-99 (2019). The Executive must "issue a detainer" and "expeditiously take custody of" these aliens after "the alien is released," from federal, state, or local officials "without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense." 8 U.S.C. § 1226(c)(1), (3). Such aliens may be released only if DHS determines "that release of the alien from custody is necessary" to protect a witness to a "major criminal activity" or a similar person, and then only if the alien "will not pose a danger" to public safety and is not a flight risk. *Id.* § 1226(c)(4).

Congress recently amended § 1226(c) through the Laken Riley Act, Pub. L. No. 119-1 § 139 Stat. 3 (2025), which additionally requires the Attorney General to "take into custody" criminal aliens who (1) are inadmissible because they are physically present in the United States without admission or parole (8 U.S.C. § 1182(a)(6)(A)), have committed a material misrepresentation or fraud, (*id.* § 1182(a)(6)(C)), or lack required documentation, (*id.* § 1182(a)(7)); and (2) are "charged with, [] arrested for, [] convicted of, admit[] having committed, or admit[] committing acts which constitute the essential elements of" certain listed offenses. *Id.* § 1226(c)(1)(E).

In July 2025, DHS issued policy guidance providing that § 1225 "is the applicable immigration detention authority for all applicants for admission." *Martinez v. Villegas*, No. 1:25-CV-256-H, 2026 WL 114418, at *6 (N.D. Tex. Jan. 15, 2026) (citations and internal quotations omitted). The Board of Immigration Appeals (BIA) later adopted this approach. *See id.* (citing *Hurtado*, 29 I. & N. Dec. at 220).

Courts are divided over whether § 1225(b)(2) or § 1226(a) governs detention of an alien who entered without admission and later was apprehended in the interior. *Compare Castanon-Nava v. U.S. Dep't of Homeland Sec.*, 161 F.4th 1048 (7th Cir. 2025), *with Buenrostro-Mendez*, 166 F.4th 494. Palma urges the Court to join those holding that § 1225(b)(2) does not apply to him, thereby making bond available

under § 1226(a). *See* Doc. 1 at ¶¶4, 6-7. The Court rejects Palma's invitation and joins other recent decisions of the Northern District applying § 1225(b)(2) to aliens like him. *See, e.g.*, *Mejia Ayala*, 2026 WL 501113, at *8; *Martinez v. Powell*, No. 7:26-CV-145-AMM-HNJ, Doc. 23, at 8 (N.D. Ala. Feb. 25, 2026) ("[T]his Court analyzes the statutory interpretation question the same way the Fifth Circuit analyzed it in *Buenrostro-Mendez*.").

## DISCUSSION

Palma's petition presents four counts. He asserts that each justifies his immediate and unconditional release, yet he ultimately bears the burden of proving that his custody violates federal law. *Whitfield v. U.S. Sec'y of State*, 853 F. App'x 327, 329 (11th Cir. 2021); *Martin v. Beto*, 397 F.2d 741, 749 (5th Cir. 1968). The Court addresses his arguments in turn.

## I.    Count 1: Unlawful Arrest

Palma contends his arrest and detention violate 8 U.S.C. § 1226(a) and the Fourth Amendment. Doc. 1 at ¶101. Relying on § 1226(a)'s warrant requirement, he asserts that his arrest was warrantless and thus constituted an unreasonable seizure. *Id.* He further asserts that his continued detention is "fruit of the poisonous tree" that can be remedied only by immediate release. *Id.* at ¶103.

Section 1226(a) requires warrants for arrests. *See* 8 U.S.C. § 1226(a) (authorizing arrest "[o]n a warrant issued by the Attorney General"). But the

Constitution does not prohibit arrests made in violation of statute. *See Virginia v. Moore*, 553 U.S. 164, 176-78 (2008). The Fourth Amendment permits warrantless arrests where the arresting officer possesses probable cause. *See Andrews v. Marshall*, 845 F. App'x 849, 853 (11th Cir. 2021); *D.C. v. Wesby*, 583 U.S. 48, 56 (2018). Assuming that Palma's arrest was warrantless, it may still have been constitutional if the arresting officers had probable cause to believe that he committed a crime in their presence or had committed a felony.

Regardless, habeas is not a vehicle to redress defects in an initial arrest; its function is to determine whether the petitioner may lawfully remain in custody. *See U.S. ex rel. Bilokumsky v. Tod*, 263 U.S. 149, 158 (1923). If lawful grounds for detention exist, Palma is not entitled to release even if there were flaws in his original arrest. *Id.*; *see also, e.g.*, *Buriev v. Warden, GEO, Broward Transitional Ctr.*, No. 25-CV-60459, 2025 WL 2763202, at *3 (S.D. Fla. Sept. 26, 2025) ("[A]n unlawful arrest, by itself, doesn't warrant release[.]"); *Williams v. Sec'y, Dep't of Corr.*, No. 5:17-CV-309, 2019 WL 2717202, at *4 (M.D. Fla. June 28, 2019) ("[A] Fourth Amendment violation during arrest does not by itself warrant habeas relief."); *Abraham v. Wainwright*, 407 F.2d 826, 828 (5th Cir. 1969) ("Even if, arguendo, [the petitioner's] arrest was illegal, that alone does not present grounds for habeas corpus relief unless such arrest in some way deprived the petitioner of a fair trial.").

Nor does the exclusionary rule operate to bar the Government from relying on Palma's illegal presence or identity in detaining him, even if his initial arrest was unconstitutional. *See I.N.S. v. Lopez-Mendoza*, 468 U.S. 1032, 1039-40 (1984). If that lesser remedy is unavailable to Palma, the greater remedy of immediate release is not available either.

Accordingly, Count 1 fails as a matter of law. The Court will **DENY** Count 1's request for habeas relief.

## II.   Count 2: Unlawful Detention

Palma contends that he is entitled to habeas relief because he belongs to a certified class of aliens who obtained declaratory relief and the remedy of vacatur in *Maldonado Bautista v. Santacruz*, a case filed in the Central District of California. Doc. 1 at ¶¶104-106. The Central District of California concluded that 8 U.S.C. § 1225(b)(2) does not apply to aliens apprehended within the interior years after their unlawful entry. *See Bautista v. Santacruz*, No. 5:25-CV-01873, 2025 WL 3289861 (C.D. Cal. Nov. 20, 2025). The court then certified a class of noncitizens present without lawful status who (1) entered without inspection, (2) were not apprehended upon arrival, and (3) were not subject to detention under 8 U.S.C. §§ 1226(c), 1225(b)(1), or 1231 at the time of DHS's initial custody determination. *Bautista v. Santacruz*, No. 5:25-CV-01873, 2025 WL 3288403, at *9 (C.D. Cal. Nov. 25, 2025). The court purportedly vacated DHS's policy of applying § 1225(b)(2) to applicants

for admission like Palma; rejected the BIA's decision in *Matter of Yajure Hurtado*, which held that aliens who enter without admission are not entitled to bond hearings; and purported to extend declaratory relief to the class. *Id.* Critically, however, the *Bautista* court did not purport to grant habeas relief to class members outside the Central District, as the court recognized that it lacked the jurisdiction to do so. *Bautista v. Santacruz*, No. 5:25-CV-01873, 2025 WL 3713987, at *30 (C.D. Cal. Dec. 18, 2025) ("To the extent Petitioners seek habeas relief for class members in immigration detention outside of this judicial district, the Court reiterates such an action would be *ultra vires*; there is no habeas jurisdiction to do so."), *judgment entered sub nom. Maldonado Bautista v. Noem*, No. 5:25-CV-01873, 2025 WL 3678485 (C.D. Cal. Dec. 18, 2025).

Palma certainly falls within the *Bautista* class.[1] He entered the United States without inspection, was not apprehended at the border, and has lived here continuously for over two years, thus §§ 1226(c), 1225(b)(1), and 1231 do not apply to him. *See* Doc. 1 at ¶23. The question is then whether the Court should apply collateral estoppel and grant habeas relief on that ground.

---

[1] This is assuming that the class certification was valid. It is unlikely that the Central District had authority to certify the Bond Eligible Class, as 8 U.S.C. § 1252(e)(1) limits class actions challenging the implementation of § 1225(b) to the District for the District of Columbia. *See Calderon Lopez v. Lyons*, No. 1:25-CV-226, 2025 WL 3683918, at *11 (N.D. Tex. Dec. 19, 2025).

Collateral estoppel, also known as issue preclusion, "is properly invoked 'if the issue in the subsequent proceeding is identical to the one involved in the prior action, the issue was actually litigated, and the determination of the issue was necessary in the prior action.'" *Cotton States Mut. Ins. Co. v. Anderson*, 749 F.2d 663, 666 (11th Cir. 1984) (quoting *Williams v. Bennett*, 689 F.2d 1370, 1381 (11th Cir. 1982)). But even when that test is met, courts do not automatically apply preclusion. "Collateral estoppel is an equitable doctrine," and "[t]he offensive use of collateral estoppel raises particular judicial concerns," chief among them whether its application is consistent with "fairness to both parties." *Id.* An abuse of "discretion will result if 'there is a significant likelihood of substantial unfairness' to the parties if preclusion is applied." *Id.* (quoting *Deweese v. Town of Palm Beach*, 688 F.2d 731, 734 (11th Cir. 1982)). Here, there are numerous reasons why applying collateral estoppel would produce substantial unfairness to the government and conflict with the doctrine's equitable roots.

First, giving *Bautista* preclusive effect in this habeas proceeding would extend the judgment beyond both its terms and lawful reach. The *Bautista* court understood it lacked authority to grant nationwide habeas relief, and so it did not. *Bautista*, 2025 WL 3713987 at *30. It instead issued class-wide declaratory relief, reasoning that such relief would not "interfere with the Government's efforts to detain noncitizens under [Section] 1225(b)(2)" because "a declaratory judgment … 'is not ultimately

coercive.'" *Id.* at *18 (quoting *Steffel v. Thompson*, 415 U.S. 452, 471 (1974)).[2] But treating that declaration as preclusive here would give it coercive effect. Rather than exceed its jurisdiction by ordering nationwide habeas relief, the *Bautista* decision would supply all the elements necessary for that relief and impose them indirectly through other courts. The result would be nationwide habeas relief by another name. But a district court's habeas jurisdiction extends only to its borders. *See* 28 U.S.C. § 2241(a). And "[w]hat cannot be done directly cannot be done indirectly." *SFFA v. Harvard*, 600 U.S. 181, 230 (2023) (quoting *Cummings v. Missouri*, 71 U.S. 277, 325 (1866)). Equity does not permit, much less require, Palma's jurisdictional end run.

Second, while the *Bautista* court's final judgment was in effect for a few months, on March 6, 2026, the Ninth Circuit entered an administrative stay of the order "insofar as the district court's judgment extends beyond the Central District of California." *See Maldonado Bautista v. Dep't of Homeland Sec.*, No. 26-1044, Doc. 5.1 at 1 (9th Cir. Mar. 6, 2026). Likewise, "[t]he district court's February 18, 2026 order granting petitioners' motion to enforce the judgment and vacating *Matter of Yajure Hurtado*" has been stayed. *Id.* at 2. While "[t]he federal rule is that the

---

[2] Interfering with 1225(b)'s enforcement would have violated the INA's venue provision, which limits challenges to § 1225(b)'s enforcement to the District for the District of Columbia. *See* 8 U.S.C. § 1252(e). To give the order preclusive effect would effectively allow the Central District's declaratory relief to operate as a *de facto* injunction against 1225(b)'s enforcement, thereby violating § 1252(e).

pendency of an appeal does not suspend the operation of an otherwise final judgment as res judicata or collateral estoppel," *Hunt v. Liberty Lobby, Inc.*, 707 F.2d 1493, 1498 (D.C. Cir. 1983), the judgment is currently not in effect as to Palma, *see Coleman v. Tollefson*, 575 U.S. 532, 539 (2015) ("Unless a court issues a stay, a trial court's judgment … normally takes effect despite a pending appeal."). Thus, it is doubtful that collateral estoppel is available to him at all while the judgment is stayed. And, at a minimum, it would be substantially unfair to deny the government the benefit of the stay it has obtained by applying collateral estoppel now.

Of course, the stay may soon be lifted, at which point the judgment could again take effect unless the Ninth Circuit reverses it. But that possibility merely underscores the inequities of applying estoppel in this unique habeas context. If *Bautista* is given preclusive effect while in effect, but not while stayed, the outcomes of similar cases across the country will depend on chance: A petitioner who unluckily files his habeas petition while the judgment is stayed would receive no benefit from it. Yet if the stay lifts days later, an identically situated petitioner could invoke the judgment to obtain relief. And if the Ninth Circuit later reverses the district court's decision, another petitioner would again be denied relief. And so on. It is well established that an issue "actually litigated and determined by a valid and final judgment" may be relitigated in a subsequent action between the parties where "[t]he issue is one of law" and "a new determination is warranted … to avoid

inequitable administration of the laws." RESTATEMENT (SECOND) OF JUDGMENTS §28(2); *N. Georgia Elec. Membership Corp. v. City of Calhoun, Ga.*, 989 F.2d 429, 435 (11th Cir. 1993) (recognizing exception to collateral estoppel). Applying that exception is warranted here to avoid this bizarre and inequitable prospect.[3] The Court rejects Palma's proposal to have one district court supply the rule of decision and 93 others supply the remedy. *See* Doc. 19 at 22 ("*Bautista* supplied the declaratory and vacatur step, and this individual § 2241 proceeding provides the as-applied remedial step.").

Third, applying issue preclusion against the government would produce another form of substantial unfairness because res judicata does not run against habeas petitioners. *Baynes v. Zenk*, 215 F. App'x 932, 933 (11th Cir. 2007) (per curiam). If it were applied against the government here, an asymmetry would arise. Petitioners like Palma could align themselves with class actions challenging government action, yet suffer no preclusive consequences in a later habeas action if those suits failed. Thus, issue preclusion would give petitioners more bites at the apple than the government. To avoid such "inequitable administration of the laws," RESTATEMENT (SECOND) OF JUDGMENTS §28(2), the Court declines to give *Bautista*

---

[3] Ordinarily, class-wide relief avoids such disparities because the fortunes of class members rise and fall together with the judgment, typically through an injunction that applies uniformly to the class and that might be stayed or reversed as to the class. But the *Bautista* court did not (and could not) grant injunctive relief to the nationwide class.

preclusive effect. And if issue preclusion does not apply at all in habeas proceedings, even when invoked against the government (and it might not[4]), then Palma cannot invoke the doctrine for that reason.

Consequently, the Court will **DENY** Count 2's request for habeas relief based on *Maldonado Bautista*.

## III.    Count 3: Statutory Violation of the INA, Agency Regulations, and the *Accardi* Doctrine

Palma argues that DHS violated the INA and binding agency regulations, and thereby the *Accardi* doctrine, by denying him a bond hearing. *See* Doc. 1 at ¶¶107-114. He insists he is not an "applicant for admission" because he has lived "deep within the interior of the country" for years. Doc. 1 at ¶¶3, 57, 65.[5] For the same reason, he claims he is not "seeking admission," *id.* at ¶¶58-66, and that the discretionary bond provision in 8 U.S.C. § 1226(a) should govern his detention, *id.* at ¶37.

This argument turns on the meaning of § 1225, and "[i]n ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." *Household Credit Servs., Inc. v. Pfennig*, 541 U.S. 232, 239 (2004). Section 1225(a)(1) provides that

---

[4] *See Pinkney v. Keane*, 920 F.2d 1090, 1093 (2d Cir. 1990) (holding that a "federal court in a habeas corpus proceeding is" not "necessarily bound by a state appellate court's ruling in petitioner's favor on a matter of federal constitutional law").
[5] During a hearing on the petition, Palma's counsel abandoned this claim and conceded that Palma was, in fact, covered under 1225(a)(1)'s definition of an applicant for admission.

all aliens "present in the United States who ha[ve] not been admitted or who arrive[]
in the United States" are deemed "applicant[s] for admission." 8 U.S.C.
§ 1225(a)(1). The INA defines "admission," as the "lawful entry … into the United
States after inspection and authorization by an immigration officer." 8 U.S.C.
§ 1101(a)(13)(A). That requires formal, lawful entry. *Morales*, 2026 WL 236307, at
*4. An alien who enters without inspection therefore remains an "applicant for
admission," regardless of how long he has remained in the country or how far he has
traveled from the border. *See Mejia Olalde v. Noem*, 2025 WL 3131942, at *2-3
(E.D. Mo. Nov. 10, 2025); *Rojas v. Olson*, 2025 WL 3033967, at *6, *8 (E.D. Wis.
Oct. 30, 2025).

Section 1225(b)(2)(A) directs that an immigration officer "shall" detain "an
alien who is an applicant for admission," if the officer determines that the alien "is
not clearly and beyond a doubt entitled to be admitted." 8 U.S.C. § 1225(b)(2)(A).
Like subsection (a), subsection (b)(2) contains no exception based on the duration
of the alien's presence in the United States or the depth of the alien's incursion into
the country. That lack of exceptions is particularly noticeable given that other parts
of § 1225 do categorize certain aliens based on whether they are "arriving" or
whether they have "been physically present in the United States" for a period of
time. *See id.* §§ 1225(a)(2), (b)(1)(A)(iii)(II). But under § 1225(b)(2)(A), subject
only to limited statutory exceptions not relevant here, Congress required DHS to

detain all "applicant[s] for admission" who are not "clearly and beyond a doubt entitled to be admitted."

Palma fits squarely within that rule. He was present in the United States, had not been lawfully admitted, and does not fall within any of the exceptions to § 1225(b)(2)(A). Doc. 1 at ¶¶31-32. Nor has he established that he is "clearly and beyond a doubt entitled to be admitted." 8 U.S.C. § 1225(b)(2)(A). The statute therefore treats him as an applicant for admission. *See Buenrostro-Mendez*, 166 F.4th at 502 ("Presence without admission deems [petitioners] to be applicants for admission.") (citing 8 U.S.C. § 1225(a)(1)).

Palma claims that even if he is an "applicant for admission," he is not "an alien seeking admission," and thus is not covered by § 1225(b)(2)(A). He contends that only "applicants for admission" who are actively attempting to gain lawful admission are covered under § 1225(b)(2)(A)'s mandatory detention provision. *See* Doc. 1 at ¶65; *see also Buenrostro-Mendez*, 166 F.4th at 502 (rejecting same argument). On that view, mandatory detention would apply only to aliens who are both "applicants for admission" and affirmatively "seeking admission"—that is, those presenting themselves for lawful entry and submitting to inspection by an immigration officer. *Buenrostro-Mendez*, 166 F.4th at 502.

That reading cannot be squared with the statute's text, context, or evident purpose. As courts have recognized, the ordinary language of § 1225 draws no

meaningful distinction between "applying for" something and "seeking" it. *Buenrostro-Mendez*, 166 F.4th at 502. The statute's terms, and the English language, treat those concepts as interchangeable. *See, e.g.*, *Apply*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 1996) ("To make an appeal or request"); *Seek*, *id.* ("To ask for"); *Matthew* 7:7 (King James) ("Ask, and it shall be given you; seek, and ye shall find; knock, and it shall be opened unto you."). Thus, "[t]he everyday meaning of the statute's terms confirms that being an 'applicant for admission' is not a condition independent from 'seeking admission.'" *Buenrostro-Mendez*, 166 F.4th at 502.

That explains why the statute expressly treats them interchangeably. Section 1225(a)(3) provides that "[a]ll aliens … who are applicants for admission *or otherwise seeking admission* or readmission to or transit through the United States shall be inspected by immigration officers." And further, 8 U.S.C. § 1225(a)(5) states "[a]n applicant for admission may be required to state under oath any information sought by an immigration officer regarding the purposes and intentions of the applicant in seeking admission to the United States." As *Buenrostro-Mendez* explained, the phrase "or otherwise" indicates that "applicants for admission" are a subset of those "seeking admission." 166 F.4th at 503 (citing *Villarreal v. R.J. Johnson Tobacco Co.*, 839 F.3d 958, 963-64 (11th Cir. 2016) (en banc) (concluding that the phrase "or otherwise" means "the first action is a subset of the second

action"); *see also Kleber v. CareFusion Corp.*, 914 F.3d 480, 483 (7th Cir. 2019). Put differently, an applicant for admission is "necessarily someone who is 'seeking admission.'" *Buenrostro-Mendez*, 166 F.4th at 503. Once the applicant for admission faces an "examining immigration officer," he is necessarily "seeking admission," whether he has a colorable claim to lawfully remain in the country or not.

The contrary result makes no sense. In Palma's view, aliens in immigration proceedings who intend to remain in the country *unlawfull*y have a right to bond that is denied to those who are seeking to be present here lawfully. But those with no claim to remaining in the country lawfully have less "reason for release pending removal" than those who do. *Parra v. Perryman*, 172 F.3d 954, 958 (7th Cir. 1999). And the government has more reason to detain aliens who have no argument against their removal.

Palma's reading thus creates serious statutory problems. Limiting § 1225(a)(3) to aliens actively presenting themselves for lawful entry would effectively "eliminate the inspection requirement for aliens entering the country unlawfully" and "would return to the pre-IIRIRA regime in which illegal entrants receive favorable treatment compared to aliens lawfully undergoing admission procedures." *Buenrostro-Mendez*, 166 F.4th at 504. And it would be irreconcilable with the law governing removal proceedings, as 8 U.S.C. § 1229a recognizes "only two kinds of aliens—'applicants for admission' and those 'lawfully present in the

United States pursuant to a prior admission.'" *Morales*, 2026 WL 236307, at *7 (quoting 8 U.S.C. § 1229a(c)). Thus, "the only way [he] can avoid removal is if, as 'an applicant for admission,' he demonstrates he is entitled to be admitted and is not otherwise inadmissible under [§] 1182." *Id.* (citing 8 U.S.C. § 1229a(c)(2)(B)). There is no third category of aliens who are "applicants for admission" who are somehow *not* seeking admission.

The Supreme Court's decision in *Jennings* confirms that reading. Under § 1225, the Court explained, "an alien who 'arrives in the United States,' or 'is present' in this country but 'has not been admitted,' is treated as 'an applicant for admission.'" 583 U.S. at 287 (quoting 8 U.S.C. § 1225(a)(1)). The Court further observed that "§ 1225(b) applies primarily to aliens seeking entry into the United States ('applicants for admission' in the language of the statute)." *Id.* at 297. That description "suggests that when the Supreme Court described § 1225 as applying to aliens 'seeking admission,' it understood that to mean aliens who, like the petitioners here, are present in the United States without admission." *Buenrostro-Mendez*, 166 F.4th at 506.

Neither does applying § 1225(b) render § 1226(a) superfluous. *Contra* Doc. 1 at ¶¶68-70. The provisions operate in different spheres. Section 1226(a) governs detention of aliens who have been admitted to the United States but later become removable; for example, by overstaying their visas, committing a removable offense,

or obtaining admission through fraud. *Buenrostro-Mendez*, 166 F.4th at 504-05. By contrast, § 1225(b)(2)(A) applies to aliens who were never admitted and therefore remain applicants for admission. *Id.* at 505 n.11.

That distinction reflects a common-sense legislative judgment. Congress chose to extend additional procedural protections to aliens who entered the country lawfully—protections it did not extend to those who entered unlawfully. Nothing in the statute suggests Congress intended the opposite result, allowing unlawful entrants to adversely possess protections not afforded to those who present themselves at the border.

Palma's reliance on the purported vacatur of DHS policies is similarly unavailing. *See* Doc. 1 at 92. Even assuming DHS once afforded bond hearings to aliens in Palma's position, § 1225(b) forecloses that practice. *See Buenrostro-Mendez*, 166 F.4th at 506 ("The text says what it says, regardless of the decisions of prior Administrations. Years of consistent practice cannot vindicate an interpretation that is inconsistent with a statute's plain text.") (citing *Pereira v. Sessions*, 585 U.S. 198, 204 (2018)). Section 1225 leaves no room for contrary policies; DHS cannot be obligated to act unlawfully.

Palma entered the United States without inspection and has never been admitted. *See* Doc. 1 at ¶31. An examining immigration officer accordingly charged him as removable under 8 U.S.C. § 1182(a)(6)(A)(i) and determined that he was "not

clearly and beyond a doubt entitled to be admitted." *See* Doc. 12-1. That determination triggers § 1225(b)(2)(A)'s mandatory detention rule. Palma's claim to a bond hearing under § 1226(a) therefore rests on a misreading of the statute and fails as a matter of law. Accordingly, the Court will **DENY** Count 3's request for habeas relief.

## IV.    Count 4: Fifth Amendment Violations (Procedural & Substantive Due Process)

Palma argues his detention violates the Fifth Amendment's guarantees of substantive and procedural due process. Doc. 1 at ¶¶115-122. The Court addresses each claim in turn.

**A.** Palma argues that his detention is substantively unconstitutional because it is "arbitrary" and "serves no legitimate, non-punitive purpose." *Id.* at ¶117. He contends that civil immigration detention "is permissible only to prevent flight or danger to the community," and that because he is neither a flight risk nor a danger, detention without an individualized assessment "bears no reasonable relation to any legitimate government purpose" and constitutes an arbitrary deprivation of liberty. *Id.* But that argument conflates the statutory release standards in § 1226 with constitutional limits. Section 1226(c)(4) authorizes the Attorney General to release a detained alien if, among other things, the alien poses no danger and will likely appear for proceedings. It nowhere conditions detention on those findings, and the

availability of discretionary release is irrelevant to the constitutionality of mandatory detention.

The Fifth Amendment requires the Government to provide due process before depriving a person of life, liberty, or property. *Dep't of State v. Munoz*, 602 U.S. 899, 909-10 (2024). Due process protects not only fair procedure but certain "fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition." *Id.* at 910 (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997)).

Aliens unlawfully present in the United States have no fundamental right to move freely about the country. *See, e.g.*, *League of United Latin Am. Citizens (LULAC) v. Bredesen*, No. 3:04-0613, 2004 WL 3048724, at *4 (M.D. Tenn. Sept. 28, 2004). Rather, the Supreme Court has "long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Fiallo v. Bell*, 430 U.S. 787, 792 (1977). The Supreme Court thus "has firmly and repeatedly endorsed the proposition that Congress may make rules as to aliens that would be unacceptable if applied to citizens." *Demore v. Kim*, 538 U.S. 510, 522 (2003). Though individuals unlawfully present in the United States possess due process rights, those rights exist within the bounds set by rule and statute, as "the through line of history is recognition of the Government's sovereign authority to set the terms governing the admission

and exclusion of noncitizens." *Munoz*, 602 U.S. at 911-12. And the Supreme Court has "recognized detention during deportation proceedings as a constitutionally valid aspect of the deportation process." *Demore*, 538 U.S. at 523. The Government may, therefore, restrain aliens unlawfully present from enjoying the privileges and liberties associated with lawful presence and citizenship pending deportation, such as the right to be free from detention. *See Fernandez-Fajardo v. I.N.S.*, 193 F. Supp. 2d 877, 880 (M.D. La. 2001).

Palma's argument that the Government must individually determine whether he constitutes a danger to the community or a flight risk before continuing with his detention would, in effect, require the Government to employ the least-restrictive means to accomplish the removal of aliens. But the Supreme Court has rejected such arguments, holding that "when the Government deals with deportable aliens, the Due Process Clause does not require it to employ the least burdensome means to accomplish its goal." *Demore*, 538 U.S. at 528. And that mandatory detention does not violate due process "for the limited period" of the aliens "removal proceedings." *Id.* at 531.

**B.** Palma next argues that his detention violates procedural due process. Doc. 1 at ¶118. Invoking the three-part test of *Mathews v. Eldridge*, 424 U.S. 319 (1976), Palma contends that the time he has lived in the United States entitles him to

sufficient protected liberty interests that amount to requiring a bond hearing. Doc. 1 at ¶¶118-122.

This Court has rejected such claims before. *See, e.g.*, *Mejia Ayala*, 2026 WL 501113, at *9-11; *Martinez v. Powell*, No. 7:26-CV-145-AMM-HNJ, Doc. 23 at 9-10 (Feb. 25, 2026). Palma "is due no process beyond the process Congress gave him," and "Congress chose to withhold bond hearings from applicants for admission, so the Fifth Amendment does too." *Mejia Ayala*, 2026 WL 501113, at *11. At least one of our sister courts agrees: "The *Mathews* test, while common, is not the only tool for resolving procedural due process challenges." *Jandres-Ordonez v. Bondi*, No. 6:25-CV-084-H, 2026 WL 274493, at *12 (N.D. Tex. Jan. 23, 2026) (rejecting procedural due process challenge). The Supreme Court has "never viewed *Mathews* as announcing an all-embracing test for deciding due process claims." *Dusenbery v. United States*, 534 U.S. 161, 168 (2002); *see also Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1206 (9th Cir. 2022) ("[The] Supreme Court when confronted with constitutional challenges to immigration detention has not resolved them through express application of *Mathews*."). The Supreme Court applied the *Mathews* test to a lawful permanent resident in *Landon v. Plasencia*, 459 U.S. 21, 32-34 (1982). But legal permanent residents "have 'gain[ed] admission to our country and [have begun] to develop the ties that go with permanent residence,' meriting a level of due

process more analogous to that of a citizen." *Jandres-Ordonez*, 2026 WL 274493, at 12 (quoting *Landon*, 459 U.S. at 32).

Palma is not a legal permanent resident; he was never lawfully admitted to the United States. Doc. 1 at ¶31. He is an applicant for admission under 8 U.S.C. § 1225(a)(1) and is lawfully detained under 8 U.S.C. § 1225(b)(2)(A). Because Petitioner's detention is mandatory under § 1225(b)(2)(A), detention during his removal proceedings is a "constitutionally permissible part of that process." *Demore*, 538 U.S. at 531.

Section 1225(b)(2)(A) does not require Palma to have a bond hearing, and the Supreme Court has recognized the constitutionality of detaining individuals during the pendency of removal proceedings. *See Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 138-40 (2020) (holding that an alien never lawfully admitted "has only those rights regarding admission that Congress has provided by statute," and that "the Due Process Clause provides nothing more"); *see also Demore*, 538 U.S. at 523. "[A]n alien who tries to enter the country illegally is treated as an 'applicant for admission.'" *Thuraissigiam*, 591 U.S. at 140; *see also* 8 U.S.C. § 1225(a)(1). Again, the Supreme Court in *Thuraissigiam* held that "aliens who arrive at ports of entry—even those paroled elsewhere in the country for years pending removal—are 'treated' for due process purposes 'as if stopped at the border.'" 591 U.S. at 139.

Because Palma was never lawfully admitted, the length of time he lived in the United States has no bearing on the due process analysis under this binding precedent. "As an 'applicant for admission,' [Palma] has 'only those rights regarding admission that Congress has provided by statute.'" *Jandres-Ordonez*, 2026 WL 274493, at *12 (quoting *Thuraissigiam*, 591 U.S. at 140; citing *Landon*, 459 U.S. at 32). "With [§] 1225, Congress set the procedural rights afforded to aliens who are present in the United States without admission." *Id.* "[A]liens falling within the scope of § 1225(b)(2) 'shall be detained for a [removal] proceeding.'" *Jennings*, 583 U.S. at 297 (quoting 8 U.S.C. § 1225(b)(2)(A)). The statute "mandate[s] detention of applicants for admission until certain proceedings have concluded" and says nothing "whatsoever about bond hearings." *Id.*; *see also Kameron v. Dep't of Homeland Sec.*, No. 7:19-CV-16-WLS-MSH, 2020 WL 9460465, at *2 (M.D. Ga. Mar. 27, 2020) (same, in analyzing § 1225(b), quoting *Jennings*).

Thus, mandatory detention of an applicant for admission such as Palma during the pendency of his removal proceedings does not violate the due process clause, because constitutional protections are built into those proceedings. *See* 8 U.S.C. § 1229a; *see also Demore*, 538 U.S. at 531 (recognizing the constitutionality of detention during removal proceedings). To that end, Congress has spoken as to the due process given to aliens such as Palma. For these reasons, Palma's due process

claims fail as a matter of law. Accordingly, the Court will **DENY** Count 4's claim for habeas relief.

## CONCLUSION

Palma fails to demonstrate that he is entitled to habeas relief. Accordingly, the Court **DISMISSES** Jordan Powell, Todd Lyons, Kristi Noem, Pamela Bondi, and Mellissa Harper; **SUBSTITUTES** the warden of the Adams County Correctional facility as the proper respondent; **DENIES** Petitioner Hugo Torres Palma's habeas petition (Doc. 1) on the merits; and **DENIES AS MOOT** Palma's corresponding motion for a preliminary injunction (Doc. 4).

**DONE** and **ORDERED** this 12th day of March, 2026.

_____
**EDMUND G. LACOUR JR.**
UNITED STATES DISTRICT JUDGE